| | |
|---|---|
| 1 | ARNOLD & PORTER KAYE SCHOLER LLP     Hon. Thomas O. Rice |

ARNOLD & PORTER KAYE SCHOLER LLP                    Hon. Thomas O. Rice
Benjamin Moore, WSBA #55526
Rosemary Alito, *pro hac vice*
1601 5th Avenue, Suite 900
Seattle, WA 98101
T: +1 206 288 0103

Attorneys for Defendant
Providence Health & Services - Washington

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON
AT SPOKANE

| | |
|---|---|
| Andrea Kane, M.D.; Brook Lang, M.D.; and Christopher Rabin, D.O., <br><br> Plaintiff, <br><br> v. <br><br> Providence Health & Services-Washington d/b/a Providence Sacred Heart Medical Center, <br><br> Defendant. | No. 2:22-cv-00159 <br><br> DEFENDANT'S MOTION FOR SUMMARY JUDGMENT <br><br> HEARING DATE: OCTOBER 7, 2025 <br> *ORAL ARGUMENT REQUESTED* |

Defendant's Motion for Summary Judgment
No. 2:22-cv-00159

## I.  INTRODUCTION & RELIEF REQUESTED

In 2022, Plaintiffs Brook Lang, M.D., and Chris Rabin, D.O., sued their employer Pediatrix Medical Group of Washington, Inc., P.S., their employer's parent company, Mednax Services Inc., and Defendant Providence Health & Services-Washington alleging that they were forced to resign their employment with Pediatrix because of the behavior of Pediatrix's Corporate Medical Director Ronald Ilg. Plaintiffs settled their claims against their and Dr. Ilg's employers, Pediatrix and Mednax, in 2024. Plaintiffs, however, continue to assert state law claims for constructive discharge, gender discrimination, retaliation, negligence, and negligent infliction of emotional distress against Providence alleging that Providence failed to adequately respond to complaints about Dr. Ilg, and retaliated against them for raising those complaints.

Plaintiffs' various claims fail as a matter of law and should be dismissed. Providence was not Plaintiffs' employer under any standard. There is no evidence that Providence constructively discharged Plaintiffs, discriminated against Dr. Lang based on her gender, or retaliated against Plaintiffs for raising complaints about Dr. Ilg. With respect to their negligence claims, Plaintiffs' claims fail as a matter of law because they have failed to produce any evidence of "objective symptomatology," and, indeed, Plaintiffs' counsel affirmatively stated that Plaintiffs were not alleging that they suffered medically diagnosable conditions as a result of Providence's actions. Providence therefore respectfully requests that the Court grant its Motion for Summary Judgment and dismiss Plaintiffs' claims in their entirety.

## II.  MATERIAL FACTS

### A.  Sacred Heart Medical Center

Providence Sacred Heart Medical Center ("Providence" or "Sacred Heart") has served the Spokane community since 1887. Statement of Material Facts Not in Dispute ("SoF"), filed herewith, ¶ 1. Boasting a capacity of over 644 beds, Sacred

Arnold & Porter
One Gateway Center, Suite 1025
Newark, NJ 07102-5315
Telephone: +1 973.776.1900

Heart is one of the Northwest's largest hospitals. *Id.* Along with a variety of other services, Sacred Heart operates a Children's Hospital. Dr. Michael Barsotti, a board-certified neonatologist, serves as the Chief Administrative Officer of the Children's Hospital. SoF ¶ 2. Sacred Heart Children's Hospital is home to the Spokane region's Level 4 Neonatal Intensive Care Unit ("NICU"). SoF ¶ 3.

Providence contracts with Pediatrix Medical Group of Washington ("Pediatrix") to provide the specialized physician services necessary to care for patients in Sacred Heart's NICU. SoF ¶ 4. Plaintiffs, as well as Dr. Ilg, provided services in the Sacred Heart NICU under Providence's agreement with Pediatrix. SoF ¶ 5.

**B.     Plaintiffs' Employment with Pediatrix**

At all times relevant here, Plaintiffs were employees of Pediatrix. Dr. Lang joined Pediatrix in 2014, and Dr. Rabin joined Pediatrix in 2016. SoF ¶ 6. At the time Plaintiffs joined Pediatrix, Ronald Ilg, M.D., served as Pediatrix's corporate medical director. SoF ¶ 7. As corporate medical director, Dr. Ilg was responsible for Pediatrix's day-to-day operations while also providing medical services at the healthcare facilities serviced by the group. *Id.*

As employees of Pediatrix, Plaintiffs agreed to provide medical services at healthcare facilities throughout the "Spokane, Washington Metropolitan Area." SoF ¶ 8. Pediatrix controlled Plaintiffs' scheduling, pay, and work locations. *Id.* Pediatrix also controlled the amount that Plaintiffs charged for their services and retained authority to negotiate and enter into agreements with third parties for Plaintiffs' services. *Id.* Throughout their employment with Pediatrix, Plaintiffs worked at a variety of facilities, including Sacred Heart. SoF ¶ 9.

Under their employment agreements, Plaintiffs were required to "comply with all of [Pediatrix's] policies and procedures" including Pediatrix's "Code of Conduct

**Arnold & Porter**
One Gateway Center, Suite 1025
Newark, NJ 07102-5315
Telephone: +1 973.776.1900

and its Employee Handbook." SoF ¶ 8. Plaintiffs also agreed to "become and remain a member in good standing of the medical staff … at any hospital and/or healthcare facility" and comply "with the medical staff bylaws, rules and regulations and policies and procedures or each healthcare facility at which" they performed services. *Id.* The agreements also permitted Pediatrix to terminate Plaintiffs' employment for cause if they "fail[ed] or refus[ed] to comply with [Pediatrix's] workplace conduct policies relating to substance abuse, sexual harassment, other unlawful harassment, or work place discrimination." *Id.*

In 2017, Dr. Rabin entered into a supplemental agreement with Pediatrix to become the Pediatrix Medical Director of the Sacred Heart NICU. SoF ¶ 10. Under the terms of that agreement, Dr. Rabin was required to, among other things, "[m]anage disciplinary issues" for the Pediatrix physicians and employed allied health professionals working within the NICU. SoF ¶ 11. Specifically, the Agreement directed that "[p]hysicians who are not practicing in a manner consistent with accepted standards of care need to be counseled, provided opportunities to improve, and when necessary disciplined. Conflicts between individual physicians or medical departments also fall under the purview of the Medical Director." *Id.*

## C. Expectations for Members of Sacred Heart's Medical Staff

All physicians performing services at Sacred Heart are required to join Sacred Heart's Medical Staff. SoF ¶ 12. The Medical Staff is responsible for, among other things, "ensur[ing] all patients … are provided with quality health care in a safe environment," and "evaluat[ing] and monitor[ing] the behavior and clinical practice of medical and allied health professional staff members in order to promote and maintain safe, quality health care." *Id.* Members of the Medical Staff, including third-party providers such as Plaintiffs and the other Pediatrix physicians, are required to "follow the Providence Code of Conduct as well as the PHC Medical and Allied Health

**Arnold & Porter**
One Gateway Center, Suite 1025
Newark, NJ 07102-5315
Telephone: +1 973.776.1900

1    Professional Staff Code of Conduct." *Id.*

2         Both the Providence Code of Conduct and PHC Medical and Allied Health

3    Professional Staff Code of Conduct prohibit "discrimination, harassment, violence,

4    bullying and other abusive conduct," and direct workforce members to "promptly

5    report any incident of discrimination, harassment, workplace violence, bullying or

6    other abusive conduct to his or her supervisor, human resources, local or regional

7    compliance office or to the Providence Integrity Line."[1] SoF ¶¶ 13, 14. All workforce

8    members, including Plaintiffs, have access to Providence's incident reporting tools to

9    report complaints of harassment or other disruptive behavior. SoF ¶ 15.

10        The Medical Staff's Bylaws outline the procedure through which a member's

11   ability to practice medicine at Sacred Heart may be changed, restricted, or terminated.

12   SoF ¶ 12. Under the Bylaws' "Fair Hearing Plan," the Medical Staff will generally

13   attempt to resolve any concerns raised about a member through "collegial

14   intervention,"[2] only resorting to formal investigation and hearing procedures for

15   particularly egregious conduct or where collegial intervention has been ineffective. *Id.*

16   The "goal" of collegial intervention is to encourage cooperation among the members

17   of the medical staff to resolve issues. *Id.*

18        **D.    Providence Responds to Complaints Regarding Dr. Ilg.**

19        Beginning in the summer of 2019, Sacred Heart began receiving sporadic

20   complaints regarding Dr. Ilg's clinical care. SoF ¶ 17. Specifically, members of the

21   nursing staff complained that Dr. Ilg was not responding promptly to their requests

22   _____

23   [1] The Providence Integrity Line allows individuals to anonymously report concerns to
     Providence's compliance office. SoF ¶ 13.

24

25   [2] Per the "Fair Hearing Plan," "Collegial efforts may include, but are not limited to,
     counseling, sharing of comparative data, monitoring, and additional training or

26   education." SoF ¶ 12.

27   Defendant's Motion for Summary Judgment - 4

28   No. 2:22-cv-00159

Arnold & Porter
One Gateway Center, Suite 1025
Newark, NJ 07102-5315
Telephone: +1 973.776.1900

while on call.[3] *Id.* In response, Dr. Barsotti reported these concerns to Mednax and engaged in a collegial conversation with Dr. Ilg, indicating that staff had raised concerns about his availability and reminding him that he needed to be available to nursing staff. *Id.* Around this time, Dr. Barsotti also became aware that the Pediatrix providers in the NICU were "unhappy" with their work schedules and lack of work-life balance. SoF ¶ 18. For instance, Dr. Barsotti recalled Dr. Lang stating that she "was concerned that she was working as many shifts, if not more shifts, than Dr. Ilg" despite having moved to part-time status. SoF ¶ 19. Dr. Barsotti also reported these general concerns to Mednax. SoF ¶ 20.

Throughout the summer of 2019, Dr. Barsotti continued to monitor the NICU and report any ongoing concerns to Mednax leadership. In August 2019, Dr. Barsotti contacted Dr. Lang asking if she would be willing to share anonymous information regarding the group with him so he could elevate any concerns to Mednax leadership. SoF ¶ 21. Dr. Lang declined this invitation. *Id.*; *see also* SoF ¶ 22 (Dr. Lang testifying that she declined Dr. Barsotti's offer because she had already decided to resign and she "didn't think it was going to make any difference"). Regardless, Dr. Barsotti continued to work with Mednax leadership, Dr. Ilg, and Dr. Rabin in his role as Pediatrix medical director at the Sacred Heart NICU to address concerns with Dr. Ilg's responsiveness and clinical notes as well as ongoing concerns with Pediatrix physicians' morale. SoF ¶ 23 (September 18, 2019 email from Dr. Barsotti to Mednax Leadership noting that he is "truly worried about Ron" and describing ongoing complaints); SoF ¶ 24 (October 3, 2019 email from Dr. Barsotti to Mednax Leadership noting that he had "encouraged" Dr. Rabin to share any concerns the group had with Mednax leadership); SoF ¶ 25 (Dr. Rabin testifying Dr. Barsotti held a

---

[3] Dr. Rabin had previously resolved a similar complaint about Dr. Ilg in 2018 by speaking to him about the concern. SoF ¶ 16.

**Arnold & Porter**
One Gateway Center, Suite 1025
Newark, NJ 07102-5315
Telephone: +1 973.776.1900

meeting with Medical Staff to discuss Dr. Ilg's behavior in the fall of 2019); SoF ¶ 26 (Dr. Lang testifying that Dr. Barsotti repeatedly "check[ed] in" with her in the summer of 2019 about Dr. Ilg and informed her that Providence was "working on it").

Finally, in mid-October 2019, Providence received a complaint that indicated that Dr. Ilg may have brought a weapon onto the Sacred Heart campus. SoF ¶ 27. Dr. Barsotti immediately alerted Mednax about the complaint and began an investigation. SoF ¶ 28. Through that investigation, Dr. Barsotti determined that Dr. Ilg had not brought a weapon to the hospital and had not made "any overt threatening allegations about having a weapon," but instead had engaged in a heated discussion with a nurse manager, and the nurse manager had separately heard that Dr. Ilg mentioned having a concealed weapons permit during an off-site recruiting event with another physician. SoF ¶ 29.

While Dr. Barsotti's initial investigation alleviated Providence's immediate concern that Dr. Ilg may be bringing a weapon into the hospital, Providence remained concerned that "potentially [Dr. Ilg] was under some stress or some health issue that was impacting his ability to work well within [Sacred Heart's] system." SoF ¶ 30. Therefore, Providence asked Dr. Ilg to self-refer to the Washington Physicians Health Program ("WPHP") for evaluation.[4] SoF ¶ 31. WPHP conducted a preliminary evaluation of Dr. Ilg and informed Providence that, while Dr. Ilg may benefit from ongoing mental health treatment, it believed Dr. Ilg could continue to safely practice

---

[4] WPHP "provides early intervention, assessment, treatment referral and post-treatment health support agreements for health professionals who may not be able to practice safely due to an impairing or potentially impairing health condition." *See Program Highlights*, Wash. Physicians Health Program, [Program Highlights - How WPHP works WPHP](). The Medical Staff's policy is to refer any provider whose practice it believes may be being impacted by a health condition to the WPHP for assessment. SoF ¶ 32.

medicine. SoF ¶ 33. Dr. Ilg, however, did not return to practice at Sacred Heart following this referral, and, indeed, never returned to Sacred Heart before formally resigning from the Medical Staff in January 2021. SoF ¶ 34.

### E. Mednax Conducts Simultaneous Internal Investigation into Dr. Ilg's Leadership.

Unbeknownst to Providence, during the spring of 2019, Mednax had separately begun an investigation into Dr. Ilg's leadership at Pediatrix. SoF ¶¶ 35, 37. In the spring of 2019, Mednax received two anonymous complaints regarding Dr. Ilg. SoF ¶ 35. One complaint alleged that Dr. Ilg had made inappropriate, harassing comments towards female physicians working for Pediatrix. *Id.* The other complaint alleged concerns relating to Dr. Ilg's scheduling practices and control over Pediatrix physicians' pay. *Id.* Mednax investigated and took remedial action in response to both complaints.[5] SoF ¶ 36. Following these investigations, in June 2019, Pediatrix transferred scheduling responsibility from Dr. Ilg to Dr. Rabin and another Pediatrix Provider, Dr. Claudia Weinheimer. SoF ¶ 38. Pediatrix also subsequently removed Dr. Ilg from his role as corporate medical director in the fall of 2019. SoF ¶ 39.

### F. Plaintiffs Resign from their Employment with Pediatrix.

On September 6, 2019, Dr. Lang notified Mednax that she had accepted another position and was resigning from her position with Pediatrix effective December 5, 2019. SoF ¶ 41. She agreed, however, to remain employed an additional 26 days in exchange for receiving her "contractually agreed upon bonus … for the calendar year 2019." *Id.* Shortly before Dr. Lang's last day with Pediatrix, on December 17, 2019, Dr. Barsotti reached out to determine whether "there was anything [he] could do with

---

[5] While both Plaintiffs Lang and Rabin were interviewed as part of these investigations, neither Plaintiff claims to have made the anonymous complaints to Mednax which led to the investigations. SoF¶ 40.

**Arnold & Porter**
One Gateway Center, Suite 1025
Newark, NJ 07102-5315
Telephone: +1 973.776.1900

Mednax to keep the door open for you to be involved at [Sacred Heart] (either now or in the future)?" SoF ¶ 42. Dr. Lang replied that she "would not be opposed to staying involved with ECMO" but that she did "not want to stay employed with Mednax at all." *Id.* Dr. Lang's last day of employment with Pediatrix was December 31, 2019. SoF ¶ 44.

Dr. Rabin, on the other hand, continued to work for Pediatrix and serve as the Pediatrix Medical Director at the Sacred Heart NICU throughout most of 2020. Dr. Rabin notified Mednax of his intent to resign his position on August 19, 2020. SoF ¶ 45. His last day with Pediatrix was November 17, 2020. SoF ¶ 45. As of Dr. Rabin's last day of employment, Dr. Ilg had not worked a single shift at Sacred Heart for over a year. *See* SoF ¶¶ 34, 45.

### G. Prior to Submitting their Resignations to Pediatrix, Plaintiffs Made Few, If Any, Complaints to Providence About Dr. Ilg.

Despite the content of their Complaint, Plaintiffs readily admit that they made little to no attempt to alert Providence to any concerns they had about Dr. Ilg's behavior prior to their resignations. Neither Dr. Rabin or Dr. Lang ever submitted a complaint to Providence's Integrity line and only recalled making passing remarks to Dr. Barsotti about Dr. Ilg. SoF ¶¶ 47, 51.

Dr. Rabin recalled that he "maybe" spoke with Dr. Barsotti about his concerns regarding Dr. Ilg's scheduling practices in the spring of 2019, and that, while he can't remember what he discussed, he "believe[d]" he told Dr. Barsotti that the schedule was "bad and discriminatory." SoF ¶ 48. Other than this alleged conversation, the only affirmative effort Dr. Rabin engaged in to alert Providence of <u>any</u> concern was to carbon copy Dr. Barsotti on a June 28, 2019, email to Mednax leadership in which he accused Dr. Ilg of engaging in "scheduling antics" after Dr. Ilg reported that he could

Arnold & Porter
One Gateway Center, Suite 1025
Newark, NJ 07102-5315
Telephone: +1 973.776.1900

not work a scheduled shift because he threw out his back.[6] SoF ¶ 48.

Dr. Lang does not claim to have ever alerted Providence that Dr. Ilg was engaging in discriminatory conduct. SoF ¶ 51. Instead, Dr. Lang testified that the first and only time she raised an issue regarding Dr. Ilg with Dr. Barsotti was in "passing" in late June or early July 2019. SoF ¶ 52. Specifically, Dr. Lang testified that she told Dr. Barsotti about an incident where Dr. Ilg allegedly informed her and another Pediatrix physician that "[a]nybody who threatens my livelihood … I take that as a direct threat on my family, and those people then I will cause harm to."[7] *Id.* While this alleged statement is undeniably inappropriate, Dr. Lang admits that she did not view it as discriminatory or sexist, and that when she told Dr. Barsotti about the incident he told her he would "look into" the issue. SoF ¶ 54.

This lack of reporting is perhaps unsurprising given that almost all of the inappropriate conduct Dr. Lang alleges Dr. Ilg engaged <u>did not</u> happen at Sacred Heart, and, indeed, occurred years prior to her resignation. When asked what inappropriate comments Dr. Ilg made to her, Dr. Lang recalled Dr. Ilg (1) advising her to bring a picture of her daughter to work so she would "know what she looks like" after she complained about not having time to see her family because of her work schedule in 2014; (2) telling her that he wanted Dr. Lang's husband to attend a dinner

---

[6] During his deposition, Dr. Rabin also identified several complaints that were raised to him by Sacred Heart staff regarding Dr. Ilg's clinical care. He did not, however, report any of these concerns to Dr. Barsotti or anyone else at Providence, and, in any event, as noted above, Providence was already monitoring Dr. Ilg's care and working to resolve issues with same. SoF ¶ 50.

[7] Notably, Dr. Lang's prior testimony regarding Dr. Ilg's statement did not include the phrase "and those people then I will cause harm to." Dr. Lang previously testified that Dr. Ilg stated "any attack on my family I will take seriously and will do whatever I have to stop it, including causing harm." *See* SoF ¶ 53.

**Arnold & Porter**
One Gateway Center, Suite 1025
Newark, NJ 07102-5315
Telephone: +1 973.776.1900

to discuss Dr. Lang taking over as medical director at one of the hospitals Pediatrix staffed because Dr. Ilg "knew that we were a conservative family just like he was and that my husband actually had to make the decisions in our home" in 2015; (3) calling her and another physician "bad little girls" for trying to change Pediatrix's scheduling system in the fall of 2016; and (4) Dr. Ilg, in "around 2019-ish," laughing at something Dr. Lang said, putting his hand on her leg, and saying "My wife just doesn't understand you and I." SoF ¶ 55. While Dr. Lang found these comments and conduct inappropriate, she did not report any of the incidents to either Mednax or Providence. SoF ¶¶ 55, 56.

### H. Procedural History

Plaintiffs filed suit against Pediatrix, Mednax, and Providence on June 30, 2022. ECF No. 1. Sacred Heart's motion to dismiss Plaintiffs' complaint was initially granted by the Court on November 7, 2022, but Plaintiffs appealed that decision, and the Ninth Circuit reversed and remanded the case for discovery in December 2023. *See* ECF Nos. 38, 41, 47. During the pendency of that appeal, Plaintiffs settled their claims against Pediatrix and Mednax. SoF ¶ 57. Following remand, Plaintiffs filed an Amended Complaint reasserting their various causes of action solely against Sacred Heart. *See* ECF No. 51. Plaintiffs' Amended Complaint asserts state law claims for wrongful discharge in violation of public policy, discrimination and retaliation under the Washington Law Against Discrimination ("WLAD"), negligence, and negligent infliction of emotional distress.[8] *Id.* During discovery, Plaintiffs Lang and Rabin withdrew their claims for economic damages. SoF ¶ 58. Plaintiff's counsel further represented that Plaintiff Lang was not alleging that she suffered from a diagnosable

---

[8] A third plaintiff, Dr. Andrea Kane, voluntarily dismissed her claims against Providence in November 2024. ECF No. 59.

**Arnold & Porter**
One Gateway Center, Suite 1025
Newark, NJ 07102-5315
Telephone: +1 973.776.1900

medical condition as a result of Providence's conduct.[9] SoF ¶ 59. Discovery closed on August 11, 2025. *See* ECF No. 74 at 2. This Motion followed.

### III.     <u>EVIDENCE RELIED UPON</u>

This Motion is based upon the Declaration of Rosemary Alito, the exhibits attached thereto, and the papers and pleadings on file with the Court.

### IV.     <u>ARGUMENT</u>

**A.     Summary Judgment Standard**

Summary judgment is proper if the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The movant bears the initial burden to demonstrate the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

**B.     Plaintiffs' Constructive Discharge Claims Should Be Dismissed.**

Plaintiffs allege that they were constructively discharged in violation of public policy for "oppos[ing] practices which compromised human health and safety."[10] ECF No. 51 at 18. The tort of wrongful discharge in violation of public policy is a "narrow exception to the at-will doctrine." *Martin v. Gonzaga Univ.*, 425 P.3d 837, 842 (Wash. 2018). To establish a prima facie case of wrongful discharge in violation policy, a plaintiff must show "(1) that his or her 'discharge may have been motivated by

---

[9] Dr. Rabin similarly testified that he had not sought any medical treatment for any alleged injury. SoF ¶ 58.

[10] Given the vague nature of Plaintiffs' allegation, Providence does not concede that there is any clear mandate of public policy at issue. *See Martin*, 425 P.3d at 844 (the question of a clear mandate is one of law). Regardless, it is not necessary to resolve this question here because summary judgment is appropriate on the other bases established in this Motion.

Defendant's Motion for Summary Judgment - 11
No. 2:22-cv-00159

reasons that contravene a clear mandate of public policy,' and (2) that the public-policy-linked conduct was a significant factor in the decision to discharge the worker." *Mackey v. Home Depot USA, Inc.*, 459 P.3d 371, 384 (Wash. Ct. App. 2020) (internal citations omitted). Where, as here, a plaintiff contends that they were "constructively discharged," they must also show that "(1) the employer deliberately made the employee's working conditions intolerable, (2) a reasonable person would be forced to resign, (3) the employee resigned solely because of the intolerable conditions, and (4) the employee suffered damages." *Crownover v. State*, 265 P.3d 971, 980-81 (Wash. Ct. App. 2011).

Plaintiffs' wrongful discharge claims fail because Plaintiffs cannot establish (1) that they were employees of Providence, (2) that, even if they were employees of Providence, their working conditions were sufficiently "intolerable" to support a finding of constructive discharge, or (3) that their alleged "whistleblowing" was a "significant factor" in Providence taking any action to make their working conditions "intolerable."

       1.     <u>Plaintiffs cannot establish an employment relationship with Providence.</u>

"An action for wrongful discharge depends, by definition, upon termination of employment." *Awana v. Port of Seattle*, 89 P.3d 291, 292 (Wash. Ct. App. 2004); *see also* 16A WASH. PRAC., TORT LAW AND PRACTICE § 24:13 (5th ed.) ("[O]ne must have actually been an employee of the defendant in order to pursue a wrongful discharge claim."). To determine whether a common law employment relationship exists between parties, Washington law requires an examination of "who controlled the work to be performed;" "who paid the consideration" for work; and "who treated [the employee as such] for tax purposes." *Buhr v. Stewart Title of Spokane, LLC*, 308 P.3d 712, 716 (Wash. Ct. App. 2013) (unpublished portion). Here, it is uncontested that Plaintiffs' employment agreements were with Pediatrix, not Providence, and that

**Arnold & Porter**
One Gateway Center, Suite 1025
Newark, NJ 07102-5315
Telephone: +1 973.776.1900

Pediatrix paid their wages, set their schedules, and treated them as employees for tax purposes. As Providence was not Plaintiffs' employer, Plaintiffs' constructive discharge claim fails as a matter of law. *See Awana*, 89 P.3d at 294 ("Courts generally extend tort doctrines only where existing remedies are inadequate. Such is not the case here. Appellants were hired and fired by Alpha. A whistleblower action for wrongful discharge in violation of public policy therefore lies against Alpha.").

This conclusion is further supported by federal case law interpreting the requirements for "joint employment" under Title VII in substantially similar circumstances. For example, in *Henry v. Adventist Health Castle Medical Center*, 970 F.3d 1126, 1129 (9th Cir. 2020), the Ninth Circuit affirmed that no employment relationship existed between a defendant medical center and a plaintiff physician, even where the medical center decided which surgical assistants would support the plaintiff, supervised and paid those assistants, determined which medical record system would be used for care provided at the facility, and required the plaintiff to comply with its "Code of Conduct," "Corporate Compliance Program," and other regulations and bylaws. In rejecting the plaintiff's arguments that these factors supported a finding that the plaintiff was an employee, the Ninth Circuit reasoned as follows:

> [I]n the physician-hospital context, "[t]he level of skill required, location of the work, and source of equipment and staff are not indicative of employee status because all hospital medical staff are skilled and must work inside the hospital using its equipment." As the Tenth Circuit explained, "[w]hen a physician shows up to work in today's world—either as an independent contractor or a full-fledged employee—he no longer is likely to carry all relevant medical instruments in a black satchel." "Instead, it is expected that he will make full use of the hospital's physical facilities during the course of his service."

*Id.* at 1131-32; *see also Perry v. Pediatric Inpatient Critical Care Servs., P.A.*, 611 F. Supp. 3d 363, 384 (W.D. Tex. 2020) (hospital did not jointly employ physician who was employee of medical group that hospital contracted with to staff its Pediatric Intensive Care Department; "[N]umerous courts have held that physicians with staff privileges at hospitals are not employees despite the hospital's exercise of some

**Arnold & Porter**
One Gateway Center, Suite 1025
Newark, NJ 07102-5315
Telephone: +1 973.776.1900

control to maintain standards of patient care and record keeping."), *aff'd sub nom.*
*Perry v. VHS San Antonio Partners, LLC*, 990 F.3d 918 (5th Cir. 2021). Put simply,
the oversight inherent in the hospital-physician relationship is not sufficient to create
an employment relationship, especially where, as here, the physicians admit they were
employees of a separate entity.

### 2. Plaintiffs cannot establish "intolerable" working conditions.

Even if Plaintiffs could bring constructive discharge claims against Providence
(they cannot), their claim still fails because they cannot establish that their working
conditions were "intolerable." Constructive discharge exists only where working
conditions "would have been so difficult or unpleasant that a reasonable person in the
employee's shoes would have felt compelled to resign." *Sneed v. Barna*, 912 P.2d
1035, 1039 (Wash. Ct. App. 1996); *Crownover*, 265 P.3d at 981 ("An employee's
frustration, and even receipt of direct or indirect negative remarks, is not enough to
show intolerable working conditions."); *Brooks v. City of San Mateo*, 229 F.3d 917,
930 (9th Cir. 2000) (requiring that "working conditions deteriorate, as a result of
discrimination, to the point that they become 'sufficiently extraordinary and egregious
to overcome the normal motivation of a competent, diligent, and reasonable
employee'").

Initially, neither Plaintiff can establish intolerable working conditions because
both Plaintiffs testified that they continued to work for Pediatrix (and in Sacred
Heart's NICU) for years after Dr. Ilg's allegedly "intolerable" conduct began. Dr.
Lang testified that Dr. Ilg began making inappropriate comments to her in 2014 and
that she first raised concerns about disparities in Pediatrix's schedule by, at the latest,
2016. *See* SoF ¶ 55 (Lang Dep. 31:24-34:14). Dr. Lang, however, did not submit her
resignation until September 2019, and therefore spent at least four years working

**Arnold & Porter**
One Gateway Center, Suite 1025
Newark, NJ 07102-5315
Telephone: +1 973.776.1900

under allegedly "intolerable" conditions.[11] *See* SoF ¶¶ 41, 44. Similarly, Dr. Rabin testified that he believed he was "in an unsafe work environment" from "the time [he] started working for Pediatrix at Sacred Heart until the time [he] left and resigned." Rabin Dep. 74:2-22.[12] This extended time working under allegedly "intolerable conditions" defeats Plaintiffs' claims as a matter of law. *See Poland v. Chertoff*, 494 F.3d 1174, 1184-85 (9th Cir. 2007) (rejecting claim where employee worked under allegedly "intolerable" conditions for at least five months); *E.E.O.C. v. Mattress Firm, Inc.*, 2:13-cv-01745-GMN, 2016 WL 5417194, at *10 (D. Nev. Sept. 26, 2016) ("[T]he fact that [plaintiff] remained in his job another four years following the initiation of the allegedly intolerable conditions belies his claim of constructive discharge").

Moreover, Dr. Rabin continued to work for Pediatrix (and in Sacred Heart's NICU) for <u>over a year</u> after Dr. Ilg stopped working at Providence's facilities. While Dr. Rabin alleges that he resigned his position because he "believed that Dr. Ilg was coming back" to Sacred Heart, he admits that Dr. Ilg <u>never</u> returned to work at Sacred

---

[11] Dr. Lang also voluntarily extended her employment contract by an additional two weeks in exchange for additional monetary compensation (*see* SoF ¶¶ 41, 44) further belying her assertion that her working conditions were "so difficult or unpleasant" that she was compelled to resign. *See Young v. Buttigieg*, No. 19-cv-01411-JCS, 2022 WL 17812923, at *18 (N.D. Cal. Dec. 19, 2022) (plaintiff delaying retirement in hopes that she would receive "a monetary incentive" was "not compatible with employment conditions so intolerable that a reasonable employee feel compelled to leave").

[12] As noted in the SoF, cited portions of the July 23, 2025, Deposition of Christopher Rabin, D.O. are attached to the Declaration of Rosemary Alito, filed herewith, as Exhibit E. Cited portions of the August 6, 2025, Deposition of Brook Lang, M.D., are attached to the Alito Declaration, as Exhibit P.

**Arnold & Porter**
One Gateway Center, Suite 1025
Newark, NJ 07102-5315
Telephone: +1 973.776.1900

Heart prior to his resignation.[13] *See* Rabin Dep. 45:19-22, 75:22-76:2, 80:4-7. As Dr. Rabin's claim that his working conditions were "intolerable" is based solely on Dr. Ilg's alleged conduct, he cannot sustain his claim when it is undisputed that Dr. Ilg was no longer working at Sacred Heart at the time he resigned. *See Montero v. Agco Corp.*, 192 F.3d 856, 861 (9th Cir. 1999) (finding no constructive discharge where harassing behavior ended three to four months before plaintiff resigned); *Steiner v. Showboat Operating Co.*, 25 F.3d 1459, 1465-66 (9th Cir. 1994) (affirming dismissal of constructive discharge claim where alleged harasser had stopped working with plaintiff "two and one-half months prior to [plaintiff's] resignation"); *Peoples v. T-Mobile USA, Inc.*, No. 2:22-cv-01544-JAD-DJA, 2025 WL 1797718, at *5 (D. Nev. June 27, 2025) ("But the Ninth Circuit has 'long required that an employee asserting constructive discharge establish that his … working conditions were intolerable at the time of the employee's resignation,' and when those conditions end well before the employee quits, the claim fails." (quoting *Wallace v. City of San Diego*, 479 F.3d 616, 632-33 (9th Cir. 2007) (alteration in original)).

In any event, Plaintiffs' various allegations, even if true, are not "sufficiently extraordinary and egregious" to establish constructive discharge. Indeed, Plaintiffs' allegations fall far short of the sort of conduct that courts have found sufficient to take a claim to trial. *See, e.g.*, *Barnett v. Sequim Valley Ranch, LLC*, 302 P.3d 500, 503-04 (Wash. Ct. App. 2013) (constructive discharge claim properly went to jury where employees resigned after employer made multiple attempts to coerce them into committing perjury); *Washington v. Horning Brothers, LLC*, 339 F. Supp. 3d 1106, 1131-32 (E.D. Wash. 2018) (employer's failure to respond to complaints of sexual

---

[13] Notably, it was Dr. Rabin who reached out to Pediatrix and Dr. Ilg in April 2020 to inquire about returning Dr. Ilg to the schedule at Sacred Heart. Rabin Dep. 40:18-41:7.

Defendant's Motion for Summary Judgment - 16
No. 2:22-cv-00159

Arnold & Porter
One Gateway Center, Suite 1025
Newark, NJ 07102-5315
Telephone: +1 973.776.1900

harassment, including "unwanted touching and comments," sufficient to support constructive discharge); *Wahl v. Dash Point Family Dental Clinic, Inc.*, 181 P.3d 864, 869 (Wash. Ct. App. 2008) (sexually graphic comments "made a few times a week for at least three months and escalated until, over [plaintiff's] objections, [harasser] masturbated in the darkroom while he was supposed to be training [plaintiff] on how to duplicate x-ray film" supported claim of constructive discharge).

Plaintiffs' claims also fail because they did not provide Providence with a reasonable opportunity to correct the allegedly intolerable conditions. "[A]n employee who quits without giving his employer a reasonable chance to work out a problem has not been constructively discharged." *Poland*, 494 F.3d at 1185 (quoting *Tidwell v. Meyer's Bakeries, Inc.*, 93 F.3d 490, 494 (8th Cir. 1996)); *Binkley v. City of Tacoma*, 787 P.2d 1366, 1376-77 (1990) ("reasonable person" would file a grievance rather than quit). Here, neither Plaintiff provided Providence with a "reasonable chance" to correct their perceived concerns. Dr. Lang testified that she told Dr. Barsotti "in passing" that Dr. Ilg made what she believed to be threatening comments to her some time in late June or July 2019. SoF ¶ 52. However, when Dr. Barsotti sought to engage Dr. Lang in efforts to improve conditions at Pediatrix, Dr. Lang responded that she did "not want to be involved," and submitted her resignation shortly thereafter. *See* SoF ¶¶ 21-22, 41. Moreover, when Dr. Lang's employer asked her whether she would stay if he got rid of Dr. Ilg – the sole source of her complaints – she said no. *See* SoF ¶ 43. Dr. Rabin similarly admits that, prior to his resignation, he never asked anyone at Providence to intervene or otherwise prohibit Dr. Ilg from returning to Providence's facility, which, again, Dr. Ilg never did. SoF ¶ 46 . At the time of Dr. Rabin's resignation it had been over 12 months since Dr. Ilg – the sole source of his complaints – had set foot in Sacred Heart.

**Arnold & Porter**
One Gateway Center, Suite 1025
Newark, NJ 07102-5315
Telephone: +1 973.776.1900

3.    <u>Plaintiffs fail to establish that any alleged "whistleblowing" was a "significant factor" in an adverse action taken by Providence.</u>

Finally, Plaintiffs' constructive discharge claims should also be dismissed because Plaintiffs cannot establish that their "whistleblowing" was a "significant factor" in Providence taking any action to make their working conditions intolerable. As the Washington State Supreme Court noted in *Martin*, a plaintiff must "produc[e] evidence that the public-policy-linked conduct was a cause of the [constructive discharge]." 425 P.3d at 844. Plaintiffs cannot produce such evidence here. In *Martin*, for example, a Gonzaga University employee alleged that he had been terminated for raising safety concerns about the lack of wall padding on certain basketball courts. 425 P.3d at 843-45. The Washington State Supreme Court affirmed dismissal of the employee's claim because he had "not pointed to any evidence that his supervisors received his complaints regarding the wall padding, let alone evidence that the university reacted negatively to his suggestions." *Id.* at 845.

Here, there is simply no evidence that Providence "reacted negatively" to any concerns they may have raised about Dr. Ilg. Indeed, it is undisputed that, by the time Plaintiffs allege that they raised concerns about Dr. Ilg's behavior with Providence, Dr. Barsotti was already actively involved with coaching Dr. Ilg and urging Pediatrix to resolve any ongoing issues with the group's dynamics. SoF ¶¶17-34. Moreover, shortly after Plaintiffs allege they raised complaints about Dr. Ilg in the summer and fall of 2019, Providence requested that Dr. Ilg undergo a medical assessment with the Washington Physician Health Program. SoF ¶¶ 31-34. Following that evaluation, Dr. Ilg <u>never returned</u> to Sacred Heart Medical Center. Given this timeline, Plaintiffs cannot establish that their whistleblowing was a "significant factor" in any intolerable working conditions attributable to Providence. *See also Short v. Battle Ground School Dist.*, 279 P.3d 902, 913 (Wash. Ct. App. 2012) (constructive discharge claim properly dismissed where plaintiff "failed to demonstrate sufficient 'aggravating

Defendant's Motion for Summary Judgment - 18
No. 2:22-cv-00159

Arnold & Porter
One Gateway Center, Suite 1025
Newark, NJ 07102-5315
Telephone: +1 973.776.1900

circumstances' or a 'continuous pattern of discriminatory treatment' that occurred *after* her opposition activity").

### C. Plaintiffs' Claims Under the WLAD Should Be Dismissed.

As with Plaintiffs' constructive discharge claims, a WLAD claim also fails as a matter of law if no employment relationship exists. *DeWater v. State*, 921 P.2d 1059, 1064-65 (Wash. 1996) (requiring employment relationship under the WLAD); *Owa v. Fred Meyer Stores*, No. 2:16-CV-01236-RAJ, 2017 WL 897808, at *3 (W.D. Wash. Mar. 7, 2017) (lack of employment relationship fatal to plaintiff's WLAD discrimination and retaliation claims). While the WLAD expands the common law definition of "employer" to include "any person acting in the interest of an employer" (*see* RCW 49.60.040(10)), an entity is still only potentially liable to the extent it "acts in the interest of an employee's common law employer, directly or indirectly, in matters related to employment," and, even then, it is only "liable for ***its own discriminatory acts***." *Buhr*, 308 P.3d at 716 (emphasis added) (unpublished portion).

For example, in *Buhr*, a plaintiff sued her former employer, Stewart Spokane, and its 51% shareholder, Stewart Co., for discrimination under the WLAD. *Id.* The record evidence indicated that Stewart Spokane's president had interviewed, hired, and discharged plaintiff, and that he alone provided plaintiff's compensation and benefits, carried workers' compensation insurance for plaintiffs' benefit, and paid plaintiff's employment taxes. *Id.* In contrast, Stewart Co. had no control over the daily operations of Stewart Spokane or over the plaintiff. *Id.* The two entities maintained their own responsibility for liabilities and assets, maintained their own bank accounts, managed their own revenues and operating expenses, funded their own payroll and benefits plans, and filed independent tax returns. *Id.* The Court determined that there was no genuine issue of material fact on the "essential employment element" and granted summary judgment in favor of the defendant." *Id.*

**Arnold & Porter**
One Gateway Center, Suite 1025
Newark, NJ 07102-5315
Telephone: +1 973.776.1900

Here, as in *Buhr* and as discussed above, the record evidence does not support the contention that Providence can be held liable as Plaintiff's "employer." Their claims under the WLAD should therefore be dismissed. However, even assuming that Providence meets this "expanded definition" of employer, Plaintiffs cannot establish that <u>Providence</u> took any adverse action against them, let alone that any such action was motivated by discriminatory or retaliatory animus.

      1.    <u>Providence did not discriminate against Dr. Lang on the basis of her gender.</u>

Dr. Lang asserts that Providence "subjected" her "to discriminatory treatment on the basis of sex in connection with the terms and conditions of [her] employment." Dkt. No. 51 at 15-16. To establish a claim for hostile work environment, a plaintiff must demonstrate that she was personally subjected to harassment that: (1) was unwelcome, (2) was because of a protected characteristic, (3) affected the terms or conditions of employment, and (4) is imputable to the defendant.[14] *Blackburn v. State*, 375 P.3d 1076, 1081 (Wash. 2016); *Washington v. Boeing Co.*, 19 P.3d 1041, 1046-48 (Wash. Ct. App. 2000) (dismissing race-based and sex-based hostile work environment claims on summary judgment due to failure to establish the third and fourth elements of the claims).

To affect the terms and conditions of employment, the harassment must be "sufficiently pervasive so as to alter the conditions of employment and create an abusive working environment" as determined under the totality of the circumstances. *Glasgow v. Ga.-Pac. Corp.*, 693 P.2d 708, 711-12 (Wash. 1985). Courts consider factors such as the frequency of the conduct, its severity, whether it is physically

---

[14] To the extent that Dr. Lang is asserting that Pediatrix's scheduling model was discriminatory, that claims should be dismissed. Dr. Lang admits that Pediatrix—not Providence—controlled her schedule. *See* Lang Dep. 14:18-15:2.

Defendant's Motion for Summary Judgment - 20
No. 2:22-cv-00159

Arnold & Porter
One Gateway Center, Suite 1025
Newark, NJ 07102-5315
Telephone: +1 973.776.1900

threatening or humiliating, and whether it unreasonably interferes with the employee's work performance. *Washington*, 19 P.3d at 1046-47. Importantly, "[c]asual, isolated or trivial manifestations of a discriminatory environment *do not* affect the terms and conditions of employment to a sufficiently significant degree to violate the law." *Glasgow*, 693 P.2d at 712 (emphasis added).

If established, harassment can be imputed to a defendant in two ways: (1) if the harasser or discriminator is an owner, partner, corporate officers, or manager; or (2) if the harasser or discriminator is the plaintiff's supervisor or co-worker, but only if the employer "authorized, knew, or should have known of the harassment and … failed to take reasonably prompt and adequate corrective action." *Davis v. Fred's Appliance, Inc.*, 287 P.3d 51, 58-59 (Wash. Ct. App. 2012) (internal quotation marks omitted).

Dr. Lang's discrimination claim fails for several reasons. First, Dr. Lang cannot rely on discriminatory comments allegedly made to other individuals and not witnessed by her. In reviewing the severity of hostile work environment allegations, courts focus their analysis on the plaintiff's own experience in the workplace, not those of co-workers. For example, in *Crownover*, the court affirmed summary dismissal of a hostile work environment claim where the plaintiff cited to objectionable conduct experienced by other employees, but could not identify any harassing conduct "directed at him" within the statute of limitations. 265 P.3d at 978; *see also Doty v. PPG Indus., Inc.*, No. C14-5704BHS, 2016 WL 5253205, at *7 (W.D. Wash. Sept. 22, 2016) (dismissing hostile work environment claim where, "at most, [plaintiff] was subjected to three comments during one meeting," and declining to consider "comments … directed at other employees that [plaintiff] heard about.").

Here, Dr. Lang did not identify <u>any</u> sexually harassing or discriminatory comments made to her by Dr. Ilg (or anyone else) within the WLAD's three year statute of limitations period. *See* RCW 4.16.080(2). Indeed, the only comment that Dr.

Arnold & Porter
One Gateway Center, Suite 1025
Newark, NJ 07102-5315
Telephone: +1 973.776.1900

1   Lang testified Dr. Ilg made to her in the summer of 2019 was a comment that he

2   "would cause harm to" anyone that "threaten[ed] his livelihood." SoF ¶ 52 (Lang Dep.

3   24:7-25:13). While this comment, if made, is indisputably inappropriate, it is wholly

4   unrelated to Dr. Lang's sex. Dr. Lang's unsupported assertion that Dr. Ilg "made

5   sexual inappropriate comments to nurses" (*see* Lang Dep. 42:6-10) is insufficient to

6   establish her gender discrimination claim.

7          Second, even considering the sporadic comments that Dr. Lang purports Dr. Ilg

8   made to her over the course of five years (four comments between 2014 and 2019),

9   Dr. Lang cannot establish that those comments affected the terms and conditions of

10  her employment. Isolated incidents of harassing conduct do not affect the terms and

11  conditions of employment to an actionable degree. *Washington*, 19 P.3d at 1046-48.

12  For example, in *Washington*, the court held that the plaintiff failed to show that

13  harassing conduct affected the terms and conditions of her employment because

14  "[r]eferring to [plaintiff's] hair as 'brillo head,' while highly offensive, was an isolated

15  incident and not sufficiently pervasive to alter the conditions of her employment." *Id.*

16  (also holding that isolated occurrences of sexist comments were insufficient to support

17  hostile work environment claim where those comments "did not unreasonably

18  interfere with [plaintiff's] work performance"); *see also Brooks*, 229 F.3d at 924

19  ("[A]n isolated incident of harassment by a co-worker will rarely (if ever) give rise to

20  a reasonable fear that … harassment has become a permanent feature of the

21  employment relationship.").

22         Third, there is no legal basis to impute Dr. Ilg's alleged conduct to Sacred

23  Heart. While Dr. Ilg may have been Plaintiff's supervisor at Pediatrix, he held <u>no</u>

24  <u>supervisory role</u> at Sacred Heart. Indeed, Pediatrix contracted with Dr. Lang's fellow

25  Plaintiff, Dr. Rabin, to provide supervision of its physicians at Sacred Heart's NICU.

26  Moreover, as discussed above, Dr. Lang admits that she *never* reported any sexually

27
    Defendant's Motion for Summary Judgment - 22
28  No. 2:22-cv-00159

harassing or discriminatory comments from Dr. Ilg to Providence. *See Crownover*, 265 P.3d at 979 ("Because no complaints specifically alleging sexual harassment were made that the [employer] failed to address, any newly alleged behavior by [plaintiff] cannot be imputed."); *Chapman v. Progress Rail Servs. Corp.*, No. C14-5680, 2015 WL 73546761, at *7 (W.D. Wash. Nov. 19, 2015) (holding that plaintiff failed to satisfy imputation prong where manager only witnessed one incident of harassing behavior and "plaintiff ma[de] no showing that [manager] should have acted based on that one incident"); *see also McMillan v. Abbot Labs., Inc.*, No. C10-1708, 2013 WL 1003136, at *8 (W.D. Wash. Mar. 13, 2013) (plaintiff's belief that employer had previously responded inadequately to other harassment complaints did not "relieve her" of the requirement of reporting the conduct to establish imputation); *Crawdford v. Nat'l R.R. Passenger Corp.*, No 3:15-CV-131, 2015 WL 9239743, at *2 (D. Conn. Dec. 17, 2015) (observing that plaintiff failed to establish imputation because "nowhere in [plaintiff's] complaint [did] plaintiff make any allegation that any of these incidents were witnessed by management or that anyone, Plaintiff included, alerted management to them"); *Yandl v. Highline Pub. School, Dist. 401*, No. 80901-6-I, 2021 WL 321561, at *5 (Wash. Ct. App. Feb. 1, 2021) (unpublished) (absent evidence of actual complaints, assertion that "[c]omplaints were made, and management did nothing," is insufficient to impute harassment).

### 2. Providence did not retaliate against Plaintiffs.

To establish a prima facie case of retaliation under the WLAD, Plaintiffs must demonstrate that: (1) they engaged in a statutorily protected activity, (2) Providence took an adverse action against them, and (3) there is a causal connection between their protected activity and the adverse employment action. *See Mackey*, 459 P.3d at 383. "To prove causation, an employee must show that retaliation was a substantial factor in motivating the adverse employment action." *Id.* While retaliation need not be the

**Arnold & Porter**
One Gateway Center, Suite 1025
Newark, NJ 07102-5315
Telephone: +1 973.776.1900

"main reason" for the adverse action, the employee must show that the defendant
<u>knew</u> that the employee had engaged in protected activity at the time it made the
decision to take the adverse action." *Id.* ("[A]n employer cannot retaliate against an
employee for an action of which the employer is unaware."). Both Plaintiffs'
retaliation claims fail here because it is undisputed Providence took no adverse action
against them, let alone adverse action in retaliation for protected activity. Dr. Lang's
retaliation claim also fails because she did not engage in any protected activity with
regard to Providence.

Both Dr. Lang and Dr. Rabin admit that they never filed formal complaints with
Providence regarding alleged discrimination or harassment by Dr. Ilg. Dr. Lang does
not even claim to have <u>informally</u> reported any sexual harassment or gender
discrimination to Providence.[15] *See Alonso v. Quest Comms. Co., LLC*, 315 P.3d 610,
620-21 (Wash. Ct. App. 2013) ("A general complaint about an employer's unfair
conduct does not rise to the level of protected activity in a discrimination action under
WLAD absent some reference to the plaintiff's protected status."). Dr. Rabin only
asserts that he told Dr. Barsotti that Pediatrix's schedule was "bad and discriminatory"
sometime in the spring of 2019. SoF ¶ 48. But both Plaintiffs admit that Pediatrix <u>not</u>
Providence controlled their schedules and that shortly thereafter Pediatrix put Dr.
Rabin himself in charge of scheduling along with another doctor. SoF ¶ 38. When
there is no protected activity, there can be no retaliation.

---

[15] As noted above, the only complaint that Dr. Lang alleges she relayed to Dr. Barsotti
related to Dr. Ilg's threatening statement in the break room during the summer of
2019. And, again, while that comment was inappropriate, it was not, on its face,
discriminatory. *Cf. Estevez v. Faculty Club of Univ. of Wash.*, 120 P.3d 579, 590
(Wash. Ct. App. 2005) (noting that complaints about "comments and actions of a
romantic or sexual nature" may constitute protected statutory activity).

**Arnold & Porter**
One Gateway Center, Suite 1025
Newark, NJ 07102-5315
Telephone: +1 973.776.1900

But even if there had been protected activity, there was no adverse action by Providence. When asked in her deposition how Providence had retaliated against her, Dr. Lang stated that when she declined to become the Pediatrix Medical Director at Sacred Heart, Dr. Ilg removed her from her position as Pediatrix Medical Director at another hospital, Deaconess, that is unrelated to Providence. "Q. Okay. And the retaliation—and the retaliation -- just so I'm clear, the retaliation was that Mednax took Deaconess away from you? A. Yes.  They pulled it from me, which also pulls the stipend. …Q. So Deaconess is not controlled by Providence? A. No." Lang Dep. 58:13-59:1. This is not retaliation for protected activity and it is not an action—let alone an adverse, retaliatory action—by Providence.

Dr. Rabin's deposition testimony similarly precludes any retaliation claim. When asked what action Providence had taken in retaliation for his comment in the spring or fall of 2019 that the schedule was bad and discriminatory against part-time doctors, he admitted that Providence did not take any adverse action.  Rather, his claim of retaliation is based on <u>inaction</u>: that Providence allegedly took no action against Dr. Ilg either before or after Dr. Rabin's alleged complaint and a hostile environment that existed throughout his employment continued. Rabin Dep. 73:24-74:5. Even assuming that Washington law would allow for a claim of retaliatory hostile work environment,[16] federal cases permitting such claims require plaintiffs to show (1) the plaintiff was engaged in protected activity, (2) the employer took a materially adverse action against him (including severe harassment sufficient to discourage opposition), and (3) there is a causal connection between the protected

---

[16] Washington courts have not recognized a cause of action for harassment based on retaliation. *See Young v. King County*, No. 73521-7-I, 2016 WL 4442571, at *6 (Wash. Ct. App. Aug. 22, 2016) (unpublished) (declining to consider a "new theory" of hostile work environment based on retaliation).

**Arnold & Porter**
One Gateway Center, Suite 1025
Newark, NJ 07102-5315
Telephone: +1 973.776.1900

activity and the adverse employment action. *See Moore v. City of Philadelphia*, 461 F.3d 331, 340-41 (3d Cir. 2006). Like hostile work environment claims based on any other protected class status, plaintiffs must show that the harassment was "sufficiently severe or pervasive" so as to alter the terms and conditions of employment. *Sermonia v. Amazon.com, Inc.*, No. C04-2337 JLR, 2006 WL 223755, at *6 (W.D. Wash. Jan. 30, 2006); *see also Kirby*, 98 P.3d at 833 (Wash. Ct. App. 2004) ("[Y]elling at an employee … is not an adverse employment action.").

Dr. Rabin's retaliation claim clearly fails under this standard. Inaction that maintains the status quo that existed before alleged protected activity is not an adverse action. By Dr. Rabin's telling, his work environment was the same before and after his alleged complaint.[17] That is the death knell of his retaliation claim.

### D. Plaintiffs' Negligence and Negligent Infliction of Emotional Distress Claims Should Be Dismissed.

Plaintiffs finally nebulously allege that "Providence engaged in conduct, acts, and/or omissions" that "constitute negligence" and "negligent infliction of emotional distress." ECF No. 51 at 17. These claims fail for at least three reasons.

First, Plaintiffs' separate negligence claims are duplicative of their NIED claims because Plaintiffs seek only emotional distress damages, and Washington law treats negligence claims seeking only emotional distress damages as negligent infliction of

---

[17] Of course, as stated above at Section II.E, the work environment did change—for the better. By this time, Mednax had removed Dr. Ilg from the Corporate Medical Director position, and Dr. Rabin and another doctor had replaced Dr. Ilg as in charge of scheduling.  Moreover, it is undisputed that Providence engaged in a variety of interventions with Dr. Ilg during the summer of 2019 which ultimately culminated in his referral to WPHP after which he never returned to work at Sacred Heart. If anything, the record demonstrates that Providence took concerns about Dr. Ilg seriously, not that they engaged in retaliation based on complaints about him.

Defendant's Motion for Summary Judgment - 26
No. 2:22-cv-00159

Arnold & Porter
One Gateway Center, Suite 1025
Newark, NJ 07102-5315
Telephone: +1 973.776.1900

emotional distress claims. *See, e.g.*, *Bylsma v. Burger King Corp.*, 293 P.3d 1168, 1170-71 (Wash. 2013) (noting that a plaintiff that seeks damages in negligence for "emotional distress in the absence of physical injury" must establish the elements of negligent infliction of emotional distress); *P.E.L. v. Premera Blue Cross*, 520 P.3d 486, 499 n.24 (Wash. Ct. App. 2022) ( "Washington courts generally construe [negligence claims seeking only emotional distress damages] as NIED"), *rev'd on other grounds*, 540 P.3d 105 (Wash. 2023).

Second, Plaintiffs cannot establish NIED because they have failed to produce medical evidence of "objective symptomatology." A plaintiff seeking to recover on an NIED claim must, among other things, "prove [they] suffered emotional distress by objective symptomatology," in other words "the emotional distress must be susceptible to medical diagnosis and proved through medical evidence." *Repin v. State*, 392 P.3d 1174, 1184 (Wash. Ct. App. 2017); *see also P.E.L.*, 520 P.3d at 498 ("Objective symptomatology requires that a plaintiff's emotional distress amounts to a 'diagnosable emotional disorder' and that objective medical evidence proves both 'the severity of the distress' and 'the causal link between the [negligent behavior] and the subsequent emotional reaction.'" (alteration in original)).

Here, neither Plaintiff has produced any evidence sufficient to establish objective symptomatology. Plaintiffs did not disclose any treating providers or medical experts as witnesses, and, indeed, Dr. Rabin admits that he has not sought medical treatment for his alleged "emotional distress." SoF ¶ 59. Plaintiffs cannot rely on their own testimony alone to establish objective symptomatology. *Compare Leonard v. McMenamins Inc.*, C22-0094-KKE, 2024 WL 4188974, at *10 (W.D. Wash. Sep. 13, 2024) (deposition testimony insufficient to establish objective physical symptomatology), *and Nagarajan v. Lian*, 2023 WL 17777237, at *3 (Wash. Ct. App. Feb. 6, 2023) (unpublished), *and Hill v. Wash. Interscholastic Activities Assoc.*, No.

Defendant's Motion for Summary Judgment - 27
No. 2:22-cv-00159

80233-0-I, 2021 WL 1854332, at *6 (Wash. Ct. App. May 10, 2021) (unpublished) (testimony that Plaintiffs "suffered sleepless nights, periods of depression, stress, and anxiety" insufficient where they did not offer evidence of a "medical or mental health diagnosis"), *with Rehn v. City of Seattle*, No. 3:23-cv-01609-RAJ, 2025 WL 1810136 (W.D. Wash. Jul. 1, 2025) (allowing NIED claim to proceed where plaintiff provided reports from two experts diagnosing her with PTSD based on defendant's conduct). This is especially so where Plaintiffs expressly disclaimed any allegation that Providence caused them to experience any medically diagnosable conditions. *See* SoF ¶ 59.

Third, even if Plaintiffs could establish objective symptomatology (they cannot), Plaintiffs' claims should still be dismissed because there is no "duty to use reasonable care to avoid the inadvertent infliction of emotional distress when responding to workplace disputes." *See Snyder v. Med. Serv. Corp. of E. Wash.*, 35 P.3d 1158, 1164 (Wash. 2001) (quoting *Bishop v. State*, 889 P.2d 959, 963 (Wash. Ct. App. 1995)). As the Washington State Supreme Court has explained:

> The utility of permitting employers to handle workplace disputes outweighs the risk of harm to employees who may exhibit symptoms of emotional distress as a result. The employers, not the courts, are in the best position to determine whether such disputes should be resolved by employee counseling, discipline, transfers, terminations or no action at all. While such actions undoubtedly are stressful to impacted employees, the courts cannot guarantee a stress-free workplace.

*Id.* (quoting *Bishop*, 889 P.2d at 963).

Based on this principle, the Washington State Supreme Court has previously affirmed dismissal of an NIED claim with similar allegations to those raised here. *See Snyder*, 35 P.3d at 1160-61. In *Snyder*, the plaintiff-employee's supervisor was "an 'authoritarian,' 'belligerent,' and 'harassing-type supervisor' who routinely embarrasse[d] her subordinates in front of their peers." *Id.* On one occasion, plaintiff's supervisor mocked her in front of a group of employees during a meeting, and later

Defendant's Motion for Summary Judgment - 28
No. 2:22-cv-00159

Arnold & Porter
One Gateway Center, Suite 1025
Newark, NJ 07102-5315
Telephone: +1 973.776.1900

confronted her, poked her in the chest, and accused her of being insubordinate. *Id.* On another occasion, plaintiff's supervisor warned plaintiff that, if plaintiff told anyone that she had received a raise, "she would literally hunt [plaintiff] down and 'kill her.'" *Id.*

Following these incidents, plaintiff took a medical leave of absence, and informed her employer that she could not return to work if she was required to work under that same supervisor. *Id.* When plaintiff's employer declined to immediately reassign her, plaintiff resigned her position. *Id.* On these facts, the Washington Supreme Court affirmed dismissal of plaintiff's NIED claim on the basis that "[t]here is no duty for an employer to provide employees with a stress free workplace" and the circumstances alleged amounted to "a workplace dispute or personality difference." *Id.* at 1164-65.

As in *Snyder*, Plaintiff's allegations of workplace misconduct similarly cannot support a claim for NIED. *See also Waite v. Gonzaga Univ.*, No. 2:17-cv-00416-SAB, 2019 WL 544947, at *8 (E.D. Wash. Feb. 11, 2019) (allegations that employer, among other things, "ignor[ed] Plaintiff's concerns about discrimination and ignor[ed] Plaintiff's concerns about federal grant regulation compliance" insufficient to support NIED claim as plaintiff's allegations "are precisely the types of normal workplace personality disputes that do not give rise to an NIED claim").

## V.     **CONCLUSION**

For all of the foregoing reasons, Providence respectfully requests that the Court grant its Motion for Summary Judgment as to all of Plaintiffs' claims.


//

//

//

**Arnold & Porter**
One Gateway Center, Suite 1025
Newark, NJ 07102-5315
Telephone: +1 973.776.1900

DATED this 18th day of August, 2025.

ARNOLD & PORTER KAYE SCHOLER
LLP


By: _/s/ Rosemary Alito_
Rosemary Alito, *pro hac vice*
Rosemary.Alito@arnoldporter.com
One Gateway Center, Suite 1025
Newark, NJ 07012
T: +1 973 776 1927

By: _/s/ Benjamin Moore_
Benjamin Moore, WSBA# 55526
Ben.Moore@arnoldporter.com
1601 5th Avenue, Suite 900
Seattle, WA 98101
T: +1 206 288 0103


Attorneys for Defendant
Providence Health & Services -
Washington

Defendant's Motion for Summary Judgment - 30
No. 2:22-cv-00159

Arnold & Porter
One Gateway Center, Suite 1025
Newark, NJ 07102-5315
Telephone: +1 973.776.1900